**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: January 26, 2024.**

_____
**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WAYNE THOMAS HARWELL, JR., | § | CASE NO. 22-51321-MMP |
| | § | |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| | § | |
| CITY CENTER WICHITA FALLS, LLC & | § | |
| CITY CENTER WF, LLC, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | ADVERSARY NO. 23-05028-MMP |
| | § | |
| WAYNE THOMAS HARWELL, JR., | § | |
| | § | |
| DEFENDANT. | § | |

1

OPINION

I.    **INTRODUCTION**

    The Court tried *Plaintiffs' Original Complaint to Determine Dischargeability of Debt* ("Complaint," ECF No. 1) filed by City Center Wichita Falls, LLC, and City Center WF, LLC (collectively, "City Center").[1] City Center sought to have certain debts of Wayne Thomas Harwell, Jr. ("Harwell") declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[2] The Court finds Harwell's debts to City Center nondischargeable under §§ 523(a)(2)(A) and (a)(4).

II.    **JURISDICTION**

    The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas, dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409. Both Plaintiffs and Defendant have consented to the entry of final orders and a judgment by this Court in this adversary proceeding. ECF Nos. 9 and 10.

III.    **BACKGROUND**

    This case arises from a renovation project in Wichita Falls, Texas. City Center owns the real property and encumbrances located at 724 and 728 Indiana Avenue, Wichita Falls, Texas (collectively, "Property"). At the Property, City Center decided to convert an existing building into an apartment building, to be known as City Center Apartments ("Project"). City Center subcontracted all the HVAC[3] work for the Project to Harwell, an HVAC contractor doing business as Direct-Flo Heating and Air Conditioning. Under the City Center-Harwell subcontract ("HVAC

---

[1] "ECF" denotes the electronic filing number.
[2] All statutory references are to Title 11 of the United States Code unless otherwise specified.
[3] Heating, Ventilating and Air Conditioning.

2

Subcontract"), Harwell agreed to install an HVAC system at the Project in exchange for $173,000.[4]

The HVAC Subcontract had a draw schedule which identified the work Harwell had to complete

to justify payment by City Center, or at least paired the drawn funds to Harwell's tasks. No critical

path schedule was presented or admitted at trial. City Center paid Harwell the first $100,000 draw

near the signing of the HVAC Subcontract to allow Harwell "to procure air handlers/fan coils, duct

work, associated material and permits to start project."[5] The HVAC Subcontract required City

Center to pay Harwell the second draw of $43,800 to "[t]rim out, procure condensers, set and start

up."[6] Under the HVAC Subcontract, the final draw of $29,200 would be issued upon installation

of all (HVAC) equipment and duct work.

Despite the draw schedule, Harwell requested an early second draw of $18,000 to cover

production costs.[7] Then, in mid-December 2018, Harwell requested yet another draw of $32,000

("Condenser Draw"). According to the invoice sent to City Center, Harwell would use the

Condenser Draw "[t]o bring in 728 Indiana Condensers in preparation for installation on roof

racks. Supply house will hold until Racks are complete and crane ordered."[8] Harwell and Will

Kelty ("Kelty"), the principal of City Center, communicated about the unscheduled Condenser

Draw, and City Center then sent $32,000 to Harwell on December 24, 2018.[9]

Harwell then failed to deliver the condensers to the Project. Over the course of January

2019, Kelty repeatedly contacted Harwell asking about the status of the condensers. Harwell now

---

[4] Pl.'s Ex. 1.
[5] *Id.*; Pl.'s Ex. 2.
[6] Pl.'s Ex. 1.
[7] Pl.'s Ex. 3.
[8] Pl.'s Ex. 4.
[9] Pl.'s Ex. 5

contends (although he did not respond to Kelty with this concern at the time) that the condensers could not be delivered because City Center had not completed the "roof racks."[10] Kelty texted and emailed Harwell multiple times over the course of the month, sending pictures of the roof racks mid-construction and fully assembled, asking when the condensers would arrive. In response, Harwell would deflect, addressing other issues in the Project or not responding at all.

After two months with ineffective response from Harwell, City Center terminated the HVAC Subcontract and its relationship with Harwell and ordered new condensers to be used in the Project.[11] City Center retained Hennan Air Conditioning to replace Harwell as its HVAC contractor.[12] Harwell never delivered the condensers and never returned the $32,000 City Center paid in the Condenser Draw. After settlement negotiations failed,[13] City Center filed suit against Harwell in state court.

After Harwell filed his bankruptcy case, City Center filed this adversary proceeding, arguing that Harwell's debt should be found nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6). City Center asks that $98,288.40 (plus accrued interest and attorneys' fees) of Harwell's alleged debt be found nondischargeable. City Center asserts damages of $54,159.72 for its "cost to complete" and $44,128.68 for its "delay damages."

---

[10] The roof racks are braced metal structures on which the condensers sit.
[11] Because the condenser supplier was waiting for payment from Harwell before it would deliver the condensers, City Center managed to procure from the condenser supplier the same condensers that Harwell would have used, had he been able to pay for the condensers.
[12] Pl.'s Ex. 19.
[13] Pl.'s Ex. 10-12.

**IV.**   **DISCUSSION**

City Center argues that Harwell's alleged debt is nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6). Exceptions to discharge are narrowly construed against the objecting creditor and construed in favor of the debtor. ***Boyle v. Abilene Lumber (In re Boyle)***, 819 F.2d 583, 588 (5th Cir. 1987) (citing ***Murphy & Robinson Investment Co. v. Cross (In re Cross)***, 666 F.2d 873, 879-80 (5th Cir. 1982) (interpreting a similar provision under the Bankruptcy Act)). An objecting creditor must prove its entitlement to nondischargeability by a preponderance of the evidence. ***Grogan v. Garner***, 498 U.S. 279, 287 (1991).

**A.  Nondischargeability Under § 523(a)(2)(A)**

*i.     Harwell's Liability for Fraudulent Misrepresentations*

Section 523(a)(2)(A) provides that a debtor may not receive a discharge from any debt for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The Court must distinguish between claims of false pretenses and false representations on one hand and claims of actual fraud on the other. ***Husky Int'l Elecs. Inc. v. Ritz,*** 578 U.S. 355, 366 (2016); ***RecoverEdge L.P. v. Pentecost***, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The terms in § 523(a)(2)(A) must be construed to contain the "elements that the common law has defined them to include." ***Field v. Mans***, 516 U.S. 59, 69 (1995).

To succeed on a nondischargeability claim for false pretenses or false representations, the creditor must show that a debtor made 1) knowing and fraudulent falsehoods, 2) describing past or current facts, that 3) the creditor reasonably relied on. ***In re Shurley***, 2021 WL 5508518, at *7 (Bankr. W.D. Tex. Nov. 24, 2021) (citing ***RecoverEdge L.P.*** 44 F.3d at 1292-1293). Successful

5

claims involve "intentional conduct intended to create or foster a false impression." ***Shurley*** at *7. The Court must consider whether the circumstances "'"in the aggregate present a picture of deceptive conduct on the part of the debtor, which betrays an intent on the part of the debtor to deceive his creditors.'" ***In re Sigler***, 2023 WL 4610749, at *7 (Bankr. W.D. Tex July 17, 2023) (quoting ***In re Whittington***, 530 B.R. 360, 383 (Bankr. W.D. Tex. 2014)).

Mere representations of a party's intention or promises of future performance are not actionable as false representations under § 523(a)(2)(A). ***Bank of La. v. Bercier (Matter of Bercier)***, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on separate grounds). Promises of future performance alone do not make a debt nondischargeable, even if there is no excuse for the later breach. ***Jacobson v. Ormsby (In re Jacobson)***, 2006 WL 2796672, at *8 (Bankr. W.D. Tex. Sept. 26, 2006). The "'false representations and false pretenses [must] encompass statements that falsely purport to depict *current or past facts*. [A debtor's] promise…related to [a] *future action* [which does] not purport to depict current or past fact…therefore cannot be defined as a *false representation or false pretense*.'" ***Bercier***, 934 F.2d at 692 (quoting ***In re Roeder***, 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986)) (emphasis in original).

A debtor's failure to fulfill a contractual promise, however, may be nondischargeable if the debtor did not intend to perform its obligations under the contract when the promises were made. ***In re Coutts***, 2023 WL 5813173, at *11 (Bankr. E.D. Tex. Sept. 7, 2023). In construction contract cases, courts have often determined debts to be nondischargeable where the contractor-debtor intentionally misrepresents a material fact or qualification. *See*, *e.g.*, ***In re Clark***, 330 B.R. 702, 707 (Bankr. C.D. Ill. 2005) (holding a remodeling debt nondischargeable after the contractor lied about being licensed and insured); ***In re Fuselier***, 211 B.R. 540, 545 (Bankr. W.D. La. 1997)

6

(holding a debt nondischargeable because contractor-debtor falsified documents pertaining to licensure); *In re McDaniel*, 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994) (finding a debt nondischargeable because the debtor misrepresented that he was an architect).

City Center argues that Harwell made false representations to City Center about the Project and that Harwell knew the representations were false when he made them. City Center alleges Harwell misrepresented that the Project was "turnkey" (i.e., that the contract price included labor and materials to install the specified HVAC system) and that Harwell had sufficient capable personnel to complete the Project in a good and workmanlike manner in the time allotted. At trial, City Center also argued that Harwell's request for the Condenser Draw "to bring in" the condensers was a misrepresentation because Harwell never intended to use the money for the condensers.

The evidence shows that Harwell intentionally deceived City Center into giving him the Condenser Draw to deliver and install the condensers to the Project.[14] Harwell's communications with Kelty just before the disbursement of the Condenser Draw show Harwell knew Kelty needed the condensers immediately delivered and installed to keep the Project on track, and Harwell pressured Kelty to pay the Condenser Draw in exchange for Harwell's quick delivery and installation of the condensers. Once Harwell received the draw, however, Harwell's haste dissipated. Kelty and other Project contractors repeatedly reached out to Harwell asking when the condensers would be delivered and sending pictures of the completed roof racks.[15] Reviewing Plaintiff's Exhibit 8, Kelty personally asked Harwell about the condensers over fifteen times

---

[14] Pl.'s Ex. 5.
[15] Pl.'s Ex. 8.

throughout January 2019. Each time, Harwell either gave no response or would redirect the conversation to other issues on the Project. Although at trial Harwell testified that he could not bring in the condensers because of Kelty's failure to construct the roof racks, this was never a reason given in January 2019, and appears to have simply been a pretense concocted for trial.

While stalling on the condensers in mid-January 2019, Harwell used the funds from the Condenser Draw to pay for personal expenses and other projects. Harwell's bank records (which he testified were from the only bank account he used) show Harwell spending thousands at hardware supply centers in Corpus Christi, Texas, and Bloomington, MN, presumably on other HVAC projects.[16] The bank records also show that Harwell's daily ledger balance fell below $32,000.00 from January 8th through January 14th, and from January 24th through the end of the month. As mentioned above, Kelty was repeatedly contacting Harwell over the course of January 2019 about the condensers. After he received the Condenser Draw, Harwell never addressed the delay, never made a commitment of when he would deliver the condensers, and never even mentioned the condensers.

Accordingly, the Court finds that Harwell intended to deceive City Center when he requested the Condenser Draw. A debtor's intent to deceive under § 523(a)(2)(A) is often difficult to prove by direct evidence, so the Court considers the totality of the circumstances when determining whether the debtor intended to deceive the creditor. ***Sigler*** at *7, *see also* ***Whitcomb v. Smith***, 572 B.R. 1, 16 (1st Cir. B.A.P. 2017) (stating that the focus "should be on whether the surrounding circumstances or the debtor's actions appear so inconsistent with [his] self-serving

---

[16] Pl.'s Ex. 9 at "DIRECTFLO 001197-001210."

statement of intent that the proof leads the court to disbelieve the debtor") (internal citations omitted). The Court finds that Harwell never intended to use the funds given to purchase the condensers for the Project, and instead used them to cover costs on other projects unrelated to City Center and on personal expenses. That is not to say Harwell never intended to purchase the condensers, merely that Harwell never intended to use the specific funds in the Condenser Draw to purchase the condensers. Harwell likely hoped that future payments from other projects would similarly pay for City Center's condensers.

The Court finds that Harwell's testimony about why he did not deliver the condensers lacked credibility. During testimony, Harwell vacillated between blaming the lack of roof racks, blaming his time commitments on other projects, and quibbling with the meaning of "bringing in" condensers when asked why he didn't deliver as promised. Harwell offered none of these reasons when Kelty asked him in January 2019, and these excuses appear to be after-the-fact justifications.

The Court finds that City Center has carried its burden to show that Harwell intended to deceive City Center when he requested a $32,000 draw to "bring in" the condensers. The Court further finds that City Center reasonably relied on Harwell's representations that the Condenser Draw would be used to promptly purchase and set the condensers. Therefore, Harwell's request for the Condenser Draw qualifies as a "fraudulent misrepresentation" under § 523(a)(2)(A) and thus debts flowing from it are nondischargeable in bankruptcy.

ii.    *City Center's Damages for Harwell's Fraudulent Misrepresentations*

For Harwell's fraud, City Center requests $54,159.72 as "cost to complete" and $44,128.68 in "delay damages," for a total of $98,288.40 in damages. The "cost to complete" is calculated by

subtracting the $23,000.00 still due to Harwell on the HVAC Subcontract[17] from the $77,159.72 in actual costs to purchase and set the condensers. The delay damages, on the other hand, represent the rent lost from the delayed project. City Center calculated this amount by multiplying its average monthly 100% occupancy residential income ($22,064.34) by two for the alleged two months' delay following Harwell's failure to set the condensers.[18]

Damages nondischargeable under a claim for false representations or actual fraud under § 523(a)(2)(A) are those "arising from" the fraud, including compensatory and punitive damages. *Cohen v. de la Cruz*, 523 U.S. 213, 215 (1998). In *Cohen*, the Supreme Court broadly read the language of § 523(a)(2)(A) as excepting from discharge any "right to payment" that is "traceable" to the fraud. *Id.* at 218 ("Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge"); *see also Archer v. Warner*, 538 U.S. 314 (2003) (holding unpaid settlement proceeds from an underlying fraud claim were nondischargeable as "arising from" the initial fraud); *Fire Safe Protection Svcs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443 (Bankr. S.D. Tex. 2011) (analyzing the scope of "arising from" fraud). Of course, as with any claim for fraud, causation (both legal and proximate) must be shown for damages to be awarded. *In re Whittington*, 530 B.R. 360, 386 (Bankr. W.D. Tex. 2014) (Section 523(a)(2)(A) requires a "causal link" between the fraud and the damages asserted).

---

[17] Pl.'s Ex. 15 shows the total amount spent to purchase and set the condensers at the Project. Plaintiff's Counsel at trial explained that the final "cost to complete" amount was calculated as total cost to complete subtracted by the amounts still due on Harwell's contract.

[18] Pl.'s Exs. 40, 41, 42, and 75. City Center walked the Court through this calculation at trial, subtracting out income from commercial tenants who were unrelated to the Project.

City Center's $54,159.72 in "cost to complete" damages clearly "arises from" Harwell's fraud. Because of Harwell's misrepresentations, the condensers were never delivered to the Project and City Center was forced to separately pay for the condensers and their installation to complete the Project. The Court finds that Harwell's fraud legally and proximately caused the "cost to complete" damages of $54,159.72 and those damages are nondischargeable.

The delay damages also "arose from" Harwell's fraud and are nondischargeable.[19] City Center showed by a preponderance of the evidence at trial that Harwell's failure to deliver the condensers and his failure to effectively respond to City Center's requests for the condensers delayed the Project's completion by two months. Were it not for Harwell's misrepresentations about what the Condenser Draw would be used for, the Project would have been completed and City Center would have reached 100% capacity two months earlier. Thus, the delay damages "arise from" Harwell's fraud and are nondischargeable.

The Court will not award City Center attorneys' fees. The Bankruptcy Code, like other federal statutes, follows the so-called "American Rule" which states that parties bear their own costs of litigation unless a contract or statute provides otherwise. *In re Benites*, 2012 WL 4793469, at *9 (Bankr. N.D. Tex., Oct. 9, 2012). Texas law does not permit recovery of attorneys' fees for common law fraud. Tex. Civ. Practice & Remedies Code § 38.001(b); *MBM Fin. Corp. v.*

---

[19] The HVAC Subcontractcontract contained neither a specific delay damages provision nor a "time is of the essence" provision, which would normally seek to quantify the damages that City Center would suffer from Harwell's delays, if any, and would make it clear that Harwell's failure to timely perform would hurt City Center. Such provisions are common in construction contracts, if for no other reason than to protect an "owner" from a contractor's delay and to protect a contractor from being blamed for delays beyond its control. The lack of these provisions suggests an inability to award contractual delay damages. But *Cohen* appears to allow fraudulent delay damages where the delay flows directly from a debtor's fraud, even where contractual delay damages might not be allowed. 523 U.S. at 215.

*Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009). Moreover, the parties' contract here did not contemplate an award of attorneys' fees should a dispute arise between the parties.[20] Thus, the Court may not award City Center legal fees and court costs, much less find them nondischargeable.

For these reasons, the Court determines that $98,288.40 of City Center's claim against Harwell is nondischargeable under § 523(a)(2)(A).

**B. Nondischargeability Under § 523(a)(4)**

A debtor cannot receive a discharge for debts incurred "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." § 523(a)(4). For a creditor to succeed in a nondischargeability action under § 523(a)(4), it must show that a fiduciary relationship existed at the time of the fraud or defalcation. *Matter of Bennett*, 989 F.2d 779, 784 (5th Cir. 1993). Defalcation, rather than outright fraud, "includes the failure to produce funds entrusted to a fiduciary, even where such conduct does not reach the level of fraud." *In re Pledger*, 592 Fed. App'x. 296, 299 (5th Cir. 2015). Even so, the elements of defalcation under § 523(a)(4) include a requirement that the debtor commit an intentional wrong (a culpable state of mind). *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013).

*i.     Fraud or Defalcation under the Texas Construction Trust Fund Act*

City Center argues that § 523(a)(4) is satisfied here because of the Texas Construction Trust Fund Act. The Texas Construction Trust Fund Act ("TCTFA") provides that certain funds given to construction contractors are held in trust. Under TCTFA, "[c]onstruction payments are

---

[20] Pl.'s Ex. 1.

12

trust funds…if the payments are made to a contractor or subcontractor…under a construction contract for the improvement of specific real property in this state." Tex. Prop. Code § 162.001(a). Within bankruptcy, TCTFA "creates fiduciary duties encompassed by § 523(a)(4) to the extent that it defines wrongful conduct under the statute." *In re Nicholas*, 956 F.2d 110, 114 (5th Cir. 1992). In other words, the contractor becomes a fiduciary of its beneficiaries if the statute is triggered. To be successful under *Nicholas*, the statutory beneficiary-creditor seeking nondischargeability under TCTFA must show "(1) the contractor intentionally, knowingly, or with intent to defraud diverted trust funds and (2) the affirmative defenses in the statute do not apply." *Pledger*, 592 Fed. App'x. at 301-02 (citing *Nicholas*, 956 F.2d at 114).

Contractors who receive construction contract payments are trustees under the statute. Tex. Prop. Code § 163.002. Fees payable to a contractor are not trust funds if: 1) the contractor and property owner have entered into a written construction contract before construction, 2) the contract provides for the payment by the owner of the costs of construction and a reasonable fee for the contractor, and 3) the fee is earned as provided under the contract and paid to the contractor or disbursed from a construction account. *Id.* § 162.001(b).

Under TCTFA, a contractor-trustee acts with "intent to defraud" when it diverts funds with intent to deprive the beneficiaries or when it diverts funds and fails to maintain a construction account. *Id.* § 162.005(1). The statute further defines "misapplication of trust funds" as when a contractor-trustee "intentionally or knowingly or with intent to defraud…retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds…" *Id.* § 162.031(a).

13

Although TCTFA sets out criminal penalties for violations, Texas courts have long recognized a private cause of action in favor of the statutory beneficiaries against a party who has misapplied trust funds. *E.g.*, **Dealers Elec. Supply Co. v. Scroggins Const. Co.**, 292 S.W.3d 650, 657 (Tex. 2009); **Young v. Bella Palma, LLC**, No. 14-17-00040-CV, 2022 WL 578442, at *9 (Tex. App.—Houston [14th Dist.] Feb. 25, 2022). This liability includes personal liability against a company's principal with requisite control over funds. **Choy v. Graziano Roofing of Tex., Inc.**, 322 S.W.3d 276, 289-94 (Tex. App.—Houston [1st Dist.] 2009).

Here, City Center is not a "statutory beneficiary" under TCTFA. In a commercial construction project like the Project, a beneficiary under TCTFA is "[a]n artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state…" Tex. Prop. Code § 162.003(a). City Center does not qualify under any of those definitions.

While property owners like City Center can be beneficiaries under TCTFA, they can only be beneficiaries under a "residential construction contract." *Id.* § 162.003(b). TCTFA does not define "residential construction contract," but the Texas Property Code defines the term in other chapters in ways that preclude City Center's recovery under TCTFA.

Under chapter 53 of the Texas Property Code (entitled "Mechanic's, Contractor's, or Materialman's Lien"), a "residential construction contract" means "a contract between an owner and a contractor in which the contractor agrees to construct or repair the owner's residence, including improvements appurtenant to the residence." Tex. Prop. Code § 53.001(9). "Residence" is further defined as "the real property and improvements for a single-family house, duplex, triplex, or quadruplex or a unit in a multiunit structure used for residential purposes in which title to the

14

individual units is transferred to the owners under a condominium or cooperative system that is: (A) owned by one or more adult persons; and (B) used or intended to be used as a dwelling by one of the owners." Tex. Prop. Code § 53.001(8).

Under chapter 27 of the Texas Property Code (entitled "Residential Construction Liability"), "residence" is defined as: "the real property and improvements for a single-family house, duplex, triplex, or quadruplex or a unit and the common elements in a multiunit residential structure in which title to the individual units is transferred to the owners under a condominium or cooperative system." Tex. Prop. Code 27.001(7).

Both chapters, while not directly controlling on the definition in TCTFA, point towards defining "residential construction contract" as where an owner-dweller of a single dwelling seeks construction or improvements on that dwelling. While City Center's Project was to be used as dwellings for its tenants, City Center itself would not dwell in the improved real property. The Project is not a "single-family house" or a "unit" as a residence is defined in chapter 27, nor is the HVAC Subcontract an agreement to improve "the owner's residence" under chapter 53. Therefore, the HVAC Subcontract does not qualify as a "residential construction contract" under Tex. Prop. Code § 162.003(b), and City Center has no standing as a statutory beneficiary under TCTFA to recover for diversion of trust funds.

ii.    *Embezzlement under § 523(a)(4)*

The § 523(a)(4) exception to discharge may still apply if Harwell's actions constitute "embezzlement" or "larceny." The Court looks to federal law to define "embezzlement." ***In re Wada***, 210 B.R. 572, 576 (9th Cir. B.A.P. 1997); ***In re Hann***, 544 B.R. 326, 337 (Bankr. S.D. Tex. 2016). Embezzlement under § 523(a)(4) is the "fraudulent appropriation of property by a

person to whom such property has been entrusted, or into whose hands it has lawfully come." ***Miller v. J.D. Abrams Inc. (In re Miller)***, 156 F.3d 598, 602 (5th Cir. 1998) (citing ***Greyhound Lines Inc. v. Thurston (In re Thurston)***, 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)); *see also* ***Brady v. McAllister (In re Brady)***, 101 F.3d 1165, 1173 (6th Cir. 1996) ("A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."). To succeed, a creditor must show proof of the debtor's fraudulent intent in taking the property. ***Miller*** at 603.

Here, the Court finds that Harwell embezzled the $32,000 given in the Condenser Draw. The Court found that Harwell had the requisite fraudulent intent when he requested the Condenser Draw to "bring in" the condensers for $32,000. City Center delivered the Condenser Draw for the explicit purpose of purchasing the condensers for the Project. Harwell then misappropriated the funds when he used them on other projects and on personal expenses, as reflected in his January 2019 bank records.[21]

For these reasons, the Court finds that $32,000 of City Center's claim against Harwell is nondischargeable under § 523(a)(4). The Court notes, however, that the nondischargeable amount under § 523(a)(4) is subsumed by the nondischargeable amount under § 523(a)(2)(A) of $98,288.40 since both amounts arise from damages related to the same core conduct (misrepresentations about installing condensers in exchange for the Condenser Draw and improperly keeping Condenser Draw money without delivering and installing the condensers).

---

[21] Pl.'s Ex. 9 at "DIRECTFLO 001197-001210."

16

Thus, Harwell's total nondischargeable debt is still $98,288.40, even though $32,000 of that total debt has been found nondischargeable under two separate provisions of § 523(a).

### C. Nondischargeability Under § 523(a)(6)

Debtors may not discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." § 523(a)(6). An act is done "willfully" under § 523(a)(6) where the debtor not only intends to commit the act, but also intends for the injury to occur. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-63 (1998). An injury is "willful and malicious" where "there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998). A simple breach of contract seldom rises to "willful and malicious" behavior unless the breach was accompanied by willful and malicious tortious conduct. *Kawaauhau*, 523 U.S. at 62; *Williams v. Int'l Brotherhood of Electrical Workers Local 520*, 337 F.3d 504, 509 (5th Cir. 2003). Thus, even where a debtor intentionally breaches a contract without cause, such an action would not rise to "willful and malicious" conduct without further showing of tortious behavior.

The injury need not be physical injury—financial loss can be willful and malicious under § 523(a)(6). *See, e.g.*, *In re Kahn*, 533 B.R. 576, 589 (Bankr. W.D. Tex 2015) (holding that a knowing and deliberate unauthorized diversion of plaintiff's funds was a "willful and malicious injury"); *In re Gamble-Ledbetter*, 419 B.R. 682, 699 (Bankr. E.D. Tex. 2009) (holding that an accountant-debtor's embezzlement of nearly $1 million from a customer was nondischargeable under § 523(a)(6)); *In re Sligh*, Case No. 21-03052, 2022 WL 1101537 (Bankr. N.D. Tex, Apr.

12, 2022) (finding that the Debtor engaged in a blackmail scheme to extort payment from a famous family member).

Here, City Center has not produced sufficient evidence showing that Harwell accompanied his breach of contract with willful and malicious tortious conduct. Even though Harwell intentionally failed to deliver the condensers and diverted the Condenser Draw, there is no evidence tending to show that he did so with an intention to harm City Center. Harwell's actions also do not mirror cases like **Kahn**, **Gamble-Ledbetter**, and **Sligh** above, where the debtors engaged in repeated, intentional extortion and embezzlement. For these reasons, § 523(a)(6) is inapplicable in this case.

### D. Prejudgment and Postjudgment Interest

Without explanation or citation to authority, City Center requests pre- and postjudgment interest on any amounts found nondischargeable. Prejudgment interest makes a plaintiff whole by compensating the party for the lost use of funds while the case is pending. *In re Fieldwood Energy, LLC*, 636 B.R. 463, 473 (Bankr. S.D. Tex. 2021) (citing *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 513 (Tex. App.—El Paso 2018, no pet.)). The Fifth Circuit has held that awarding prejudgment interest under a federal statute requires a two-step analysis: "does the federal act creating the cause of action preclude an award of pre-judgment interest, and if not, does an award of pre-judgment interest further the congressional policies of the federal act." *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994). Section 523(a)(2)(A) does not preclude the award of prejudgment interest, and awarding prejudgment interest under the section furthers the congressional purpose that the Code provide a discharge only to honest debtors. *In re Ritz*, 567 B.R. 715, 767 (Bankr. S.D. Tex. 2017) (awarding

prejudgment interest on a § 523(a)(2)(A) fraudulent transfer claim). Whether a party is entitled to prejudgment interest is in the sole discretion of the court. ***Williams v. Trader Pub. Co.***, 218 F.3d 481, 488 (5th Cir. 2000).

Here, Harwell made multiple false representations about the use of the Condenser Draw over a period of at least a month and led City Center to believe he would perform. Also, the actions giving rise to this suit occurred nearly five years ago. The Court finds that under these circumstances, it would be inequitable for the Debtor "to escape without having to pay the time-value of money." ***Ritz***, 567 B.R. at 767. Therefore, the Court will award prejudgment interest on City Center's § 523(a)(2)(A) claim.

Because federal law does not set prejudgment interest in this case, the Court looks to state law to determine its rate and accrual date. *E.g.*, ***Ritz***, 567 B.R. at 768; ***In re Zohdi***, 234 B.R. 371, 385 (Bankr. M.D. La. 1999); ***Hansen v. Continental Ins. Co.***, 940 F.2d 971, 984 (5th Cir. 1991) (holding that because ERISA is silent on prejudgment interest, the court should look "to state law for guidance in determining the rate of interest"). Under Texas common law, prejudgment interest accrues beginning on the earlier of "(1) 180 days after the date a defendant receives written notice of the claim or (2) the date suit is filed." ***Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.***, 962 S.W.2d 507, 531 (Tex. 1998). Harwell received written notice of City Center's claim on February 3, 2019 from Kelty. Although this adversary was not started until February 18, 2023, City Center alleged similar causes of action in 2019 litigation it filed in state court around the same nucleus of operative facts. Therefore, in line with prejudgment interest's goal of making plaintiffs whole, the time that the "suit was filed" was April 2, 2019. That date is less than 180 days after

19

the day Harwell received written notice of the claim, so prejudgment interest started accruing on April 2, 2019.

In determining the rate of prejudgment interest, the Court again looks to state law for guidance. The Texas Supreme Court recognizes two separate bases for the award of prejudgment interest—either an enabling statute or general principles of equity. ***Johnson & Higgins of Texas, Inc***, 962 S.W.2d at 528. The Texas Finance Code provides a statutory basis for the rate of prejudgment interest only in cases for wrongful death, personal injury, property damage, or condemnation cases. Tex. Fin. Code §§ 304.104, 304.201. City Center's claim does not fall into any of those categories, so *no statute sets a prejudgment interest rate* for this case. Because there is no enabling statute providing prejudgment interest, the Court looks to Texas common law to determine the prejudgment interest rate.

Under Texas common law, the rate of prejudgment interest "accrue[s] at the same rate as postjudgment interest." ***Johnson & Higgins of Texas, Inc.***, 962 S.W.2d at 532. So, a Texas post-judgment interest rate can generally serve as a proxy for a Texas prejudgment interest rate under Texas common law. Thus here, even though the Texas Finance Code cannot serve as an enabling statute to set the *prejudgment interest rate* directly, it sets the *post-judgment interest rate* at the "prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation," Tex. Fin. Code § 304.003, which can indirectly serve as a proxy for the *prejudgment interest rate* under Texas common law.

This ***Johnson & Higgins*** proxy rule, however, does not make sense to this Court, especially where federal law, not Texas law, determines the post-judgment interest rate. The proxy rule would direct the Court to arbitrarily allow prejudgment interest at the *current* prime rate of

20

8.5%[22] (the rate at the time of computation) under Texas law, even though the events giving rise to this suit occurred nearly five years ago. Given that prejudgment interest is intended to give plaintiffs the time value of their money and to make the plaintiff whole, it makes little sense to apply the *current* prime rate if prejudgment interest is intended to compensate City Center for its inability to invest money it was deprived of in 2019, when City Center sued for Harwell's nondischargeable conduct. The arbitrary date at which any court enters its judgment should not affect the rate at which prejudgment interest is awarded. Logically, the prejudgment interest rate must be tethered to when damages are incurred. To hold otherwise would encourage gamesmanship by parties seeking to take advantage of fluctuating prime interest rates. Instead of adopting the proxy rule, the Court determines prejudgment interest is 5.5%, the prime rate as of April 2, 2019, when City Center first filed its suit in state court.[23] This ties the prejudgment interest rate assessed to the date that action was taken on the damage incurred. The Court will therefore award City Center prejudgment interest at 5.5% a year, simple interest.

Having determined the date prejudgment interest began to accrue (April 2, 2019) and the rate of accrual (5.5%), the Court awards $26,067.07 in prejudgment interest,[24] which is also nondischargeable. ***Cohen***, 523 U.S. at 223. The total amount awarded to City Center is $124,355.47, plus accrued post-judgment interest.

---

[22] *Selected Interest Rates (Daily) H.15*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (Jan. 12, 2024), http://www.federalreserve.gov/releases/h15/Current/. Applying the proxy rule to the federal post-judgment interest rate of 4.57 % lacks similar analytical rigor.
[23] *Selected Interest Rates (Daily) H.15*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (Apr. 2, 2019), https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.
[24] $98,288.40 multiplied by 5.5% interest rate, multiplied by a term of 4.822 years (1,760 days).

This Court may award post-judgment interest on "any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a); ***Ocasek v. Manville Corp. Asbestos Disease Comp. Fund***, 956 F.2d 152, 154 (7th Cir. 1992). The post-judgment interest rate is the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." According to the H.15 report compiled by the Federal Reserve, the current 1-year Treasury constant maturities weekly average is 4.75%. Thus, the judgment of $124,355.47 will accrue post-judgment interest at a rate of 4.75% a year.

## V.   CONCLUSION

For the reasons set forth above, the entirety of City Center's claim of $98,288.40 plus $26,067.07 in pre-judgment interest is found to be nondischargeable, and the Court will enter a judgment accordingly.

# # #